# EXCLUSIVE PRODUCTION AGREEMENT

Agreement made this 12th of June, 2000, by and between , R N' D Productions, Inc 2405 Wentworth St., Houston TX 77004, hereinafter referred to as ("R N D") and Jamaica Johnson D/B/A T.D.A. Inc. 714 West Amelia, Orlando, Florida 32805, hereinafter referred to as ("GRANTOR").

## 1. TERM

1.01    The term of this agreement (the "Term") will begin on the date hereof and continue, unless extended as provided herein, for a first Contract Period (sometimes referred to as the Initial Period") ending nine (9) months after delivery of the master Recordings that are required to be delivered hereunder during such Contract Period (the "Recording Obligation").

1.02    Grantor grants R N D five separate options to extend the Term for additional Contract Periods (sometimes referred to as "Option Periods"). R N D may exercise each of those options by sending Grantor a notice at any time before the expiration of the Contract Period (or, if R N D so advises, such period will begin on the date of such exercise notice) and end nine (9) months after delivery of the last master Recordings comprising the Recording Obligation for such Option Period.

## 2. RECORDING OBLIGATION

2.01    R N D hereby engages Grantor to furnish the exclusive services of Kevin Byant Jr., Andrew Michael Edgar Seely, Jeffery Erek Anderson, Kevin Maritinez, and Steven Jonathan Narvaez a.k.a. Nu Ground ("Artist") to deliver to R N D, Master Recordings as provided for herein, and to furnish the services of individual producers to produce such Master Recordings. Grantor warrants that during the Term Artist shall perform for the purpose of making Phonograph records exclusively for Grantor and R N D.

2.02    During each contract Period, Artist will perform for and Grantor will record and deliver a minimum of Master Recordings ("Minimum Recording Obligation") specified in the following schedule:

| Contract Period | Minimum Recording Obligation |
| --- | --- |
| Initial | One (1) Album |
| First Option | One (1) Album |

Petitioner's Exhibit

| Third Option | One (1) Album |
| Fourth Option | One (1) Album |
| Fifth Option | One (1) Album |

## 3. PROCEDURES

3.01    Grantor shall be responsible for coordination of recording session and Grantor, Artist and the individual producers shall render their services subject to the terms and conditions hereof to the best of their ability and in accordance with first-class standards of performance for production in the Phonograph Record industry.

3.02    Prior to making each recording, Grantor shall obtain R N D approval, of each of the following in order, before proceeding further: (i) selection of the individual producer(s) of the master Recordings hereunder , (ii) selection of Compositions to be recorded, (iii) specification of accompaniment, arrangement and copying services, and (iv) selection of dates of recording and studios where recording is to take place. At least fourteen (14) days prior to the date of the first recording session for the recording of any master recordings, grantor will submit to R N D for its written approval, a written proposed budget setting forth, in itemized detail, all anticipated Recording Costs. The scheduling and booking of all studio time will be done by R N D Grantor shall notify the appropriate local of the American Federation of Musicians in advance of each recording session. Grantor shall allow R N D's representatives to attend any or all recording sessions hereunder.

3.03    With respect to master Recordings hereunder, Grantor shall simultaneously deliver to R N D, stereo mixed down tape masters of the original multi-track recordings which are of a quality reflecting then current "state of the art" analog and/or digital recordings techniques. Such stereo mixed down tape masters shall be satisfactory for the production of lacquers and reference discs for phonograph record manufacturing, equalized tape transfers for cassette manufacturing, digital transfers for compact disc and digital cassette manufacturing, and such elements of future technology as may hereinafter be utilized in the phonograph recording industry. Upon R N D's request, Grantor shall re-record any Composition until a satisfactory Master Recording shall have been obtained. Grantor shall edit, sequence, and leader multi-track master tapes for Mater Recordings hereunder, in parallel sequence to any two-track master tapes delivered hereunder, and shall further deliver to same to R N D. All tapes and work parts of whatever nature (including, without limitation, out-takes or other tracks recorded during the Term) shall be delivered to R N D concurrently with delivery of the foregoing items under this paragraph 3.03 or maintained at a studio or other location designated by R N D in R N D's name and subject to R N D's control.

3.04    Grantor shall furnish R N D in writing with all information consents and clearances required for the recording, manufacture and distribution of Phonograph Records hereunder including, without limitation, so-called master use and mechanical

"sampling" licenses, the label copy (including song titles and any substitutes), names of composers and lyricists, complete publisher line, music performing rights organizations (BMI, ASCAP, etc.), timings, any credits to arrangers or accompanists, names of engineers, list of musician with instruments played, list of all vocalists (and whether the vocalist is a featured or background vocalist), exact recording date(s), studio location(s), album liner credits, and any information required to be submitted to unions, guilds or other third parties.

     3.05    Grantor shall secure on behalf of R N D from the copyright proprietors of Compositions not subject to compulsory license, and embodied on Recordings to be delivered to R N D hereunder, executed mechanical licenses, on the terms provided in Article 9 of this agreement, granting R N D the right to make and distribute Phonograph Records embodying such Recordings.

     3.06    Artist's performances hereunder shall be reasonably consistent in concept and style and Mater Recordings delivered hereunder will be similar in general artistic concept and style to Master Recordings previously delivered hereunder. Grantor further agrees that neither "live" performances not multiple LP Albums, or joint recordings with other royalty-receiving artist, or instrumental recordings or recordings which were not made in compliance with the provisions of this agreement shall be recorded as part of the Minimum recording obligation without R N D's prior written consent. Without limitation of the generality of the foregoing, any multiple LP Album delivered hereunder shall be deemed a single LP for the purpose of product delivery and payment of Advances. R N D agrees that it shall not require Grantor to deliver any multiple LP Album of joint recording as part of the Minimum Recording Obligation hereunder.

## 4. DELIVERY PROCEDURE

     4.01    The minimum Recording Obligation with respect to each Contract Period shall be delivered no later than ninety (90) days following commencement of such Period.

     4.02    Satisfactory completion by Grantor of the procedures in Article 3 and this Article 4 shall be among the necessary conditions to determine whether any recording has been delivered within the meaning of this agreement. R N D's election to make a payment which was to have been made upon delivery of Recordings or release such Recording shall not be deemed to be its acknowledgment that such delivery was properly made, and R N D shall not be deemed to have waived either its right to require such complete and proper performance thereafter or its remedies for Grantor's failure to perform in accordance herewith.

     4.03    All master Recordings delivered hereunder shall be recorded no earlier than six(6) months prior to delivery to R N D and shall not embody Composition which have been previously recorded by Artist (whether as a group or an individual).



Grantor shall not commence recording any Album (other than the first Album) prior to ninety (90) days after delivery to R N D the Master Recordings constituting the immediately preceding Album.

      4.04   (a) R N D shall send Grantor written notice of the date which R N D deems to be the applicable delivery date of Master Recordings hereunder. If Grantor dispute the date of such notice, Grantor shall give notice in writing to R N D within thirty (30) days of R N D's notice to Grantor. Grantor's failure to so notify R N D shall be deemed Grantor's acceptance of the date contained in R N D's notice.

      (b) If Grantor has not received any notice from R N D pursuant to paragraph 4.04(a)above within thirty(30) days after the date Grantor deems to be such applicable delivery date, then Grantor shall notify R N D within ten(10) days after such thirty(30) day period of the date Grantor deems the applicable delivery date. R N D shall have the right to object to such date within thirty (30) after receipt of Grantor's notice.

      (c) If either party objects to the date contained in the notice given by the other party, R N D and Grantor shall mutually and in good faith agree in writing on the date to be deemed the delivery date. If the parties do not reach such agreement of if neither party gives notice of the delivery date of master Recordings as provided above earlier than thirty(30) day prior to the date of initial release in the United States of such Master Recordings, then the delivery date of such Album shall be deemed to be thirty(30) day prior to such date of initial release.

## 5.RIGHTS

      5.01   Each Master Recording recorded hereunder shall be considered a "work made for hire". All Master Recordings delivered hereunder or recorded by Artist during the Term and the performances contained thereon and Recordings derived therefrom shall from inception of their creation be entirely the property of R N D in perpetuity throughout the world, under copyright and otherwise, free of any claim whatsoever by Grantor of by Artist or any other person, and R N D shall have the right to register the copyrights in such master recordings and Recordings derived therefrom in R N D's name or in the name(s) of R N D's designee(s) and to secure any and all renewals and extensions thereof. Without limiting the generality of the foregoing, Artist and Grantor hereby assign to R N D all of Artist 's and Grantor's right and title to the copyrights in perpetuity throughout the world in and to such master Recordings, Recordings and derived therefrom and any and all renewals and extensions thereof. Without limiting the generality of the foregoing, Artist and Grantor hereby assign to R N D all of Artist's and Grantor's right and title to the copyrights in perpetuity throughout the world in and to such master Recordings, Recordings derived therefrom and any and all renewals and extensions of such copyrights and R N D and its subsidiaries, affiliates, and licensees shall have the sole, exclusive and unlimited right throughout the world to manufacture Records, by any method(s) now or hereafter known embodying any potion(s) or all of the

performances embodied on Master Recordings hereunder; to publicly perform such Records; to import, export, sell, transfer, lease, license, rent, deal in or otherwise dispose of such Master Recordings and Records derived therefrom throughout the world under any trademarks, trade name or labels designated by R N D; to edit or adapt the Master Recordings hereunder to conform to the technological or commercial requirements of Phonograph Records in various formats now or hereafter known or developed, or to eliminate material which might subject R N D to any civil or criminal action; to use the master Recordings hereunder for background music, synchronization in motion picture and television soundtracks and other similar purposes, including, without any additional payments to Artist of Grantor other than s expressly set forth in paragraph 7.06 hereof; or, notwithstanding the provisions of this agreement, R N D and its subsidiaries, affiliates and licensees may, at their election, delay or refrain from doing any one or more of the foregoing.

5.02   (a) Without limiting the generality of paragraph 5.01, R N D shall have the exclusive right to publicly perform and otherwise to utilize Artist's performances in connection with Audio-Visual Recordings for promotional and commercial purposes, including without limitation, release on Audio-Visual Devices and/or CD/Video. Artist shall perform for said Recordings upon R N D request provided that Artist shall not be required to perform in any Contract Period for the recording of Audio-Visual Recordings greater in playing time than the playing time of the sound Recordings constituting the Recording Obligation in such Contract Period.

(b) Artist's compensation in connection with Artist's performances for Audio-Visual Recordings. including without limitation, those performances referred to in paragraph 10.07 hereof, shall be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining agreements pertaining thereto, provided, however, that Artist hereby waives any right to receive such compensation to the extent that such right may be waived in connection with any applicable collective bargaining agreement.

5.03   Grantor shall execute and deliver promptly to R N D any instruments of transfer and other documents R N D may reasonably request to carry out the purposes and effects contemplated by this agreement. Grantor hereby irrevocably appoints R N D as Grantor 's agent and attorney-in-fact to sing any such documents in Grantor's name and to make appropriate disposition of them consistent with this agreement and irrevocably authorizes R N D to proceed, whether in R N D's name of Grantor's name, with any appropriate action necessary to enforce R N D's rights hereunder (including, without limitation, all rights of exclusivity). Grantor acknowledges that R N D's agency and power are coupled with an interest.

5.04   R N D shall have the perpetual right, without any liability to any person, to use and to authorize other Person to use Grantor's name and biographical material and the names (including any professional names or sobriquets), and any likenesses, whether or not current,(including pictures, portraits, hereunder), autographs

5.0↑

(including, facsimile signatures) and biographical material of or relating to the Artist and any Producer for purposes of advertising, promotion and trade and in connection with other merchandising of any kind, including the making and exploitation of Records hereunder and in general goodwill advertising. Grantor warrants and represents that grantor owns the exclusive rights to so use such names, likenesses, autographs, (including facsimile signatures)and biographical materials and that the use of same will not infringe upon the rights of any Person. If any Person challenges the Artist's right to use a professional name or sobriquet, R N D may, at its election and without limiting its rights, require Grantor to cause the Artist to adopt another professional name or sobriquet approved by R N D. Without awaiting the determination of the validity of such challenge. Furthermore, during the Term, the Artist will not change the name by which Artist is professionally known without the prior written approval of R N D.

6.ADVANCES

6.01     R N D shall pay, as Advances to be charged against and be recoupable from royalties accruing to Grantor's account hereunder , the following:

(a) All Recording Costs in the approved budget. Grantor shall be responsible for the payment of all Recording Cost or other costs in connection with making master Recording which costs have not been specifically approved in writing by R N D. If R N D elects to pay any such costs for which Grantor is Responsible, then R N D shall have the right to demand reimbursement therefor from Grantor(and Grantor shall immediately make such reimbursement) and /or the right to deduct such costs from any payments to Grantor.

(b) It is expressly understood and agreed that any and all Advances paid by R N D pursuant to the terms of this paragraph 6.01 shall specifically include the prepayment of session union scale, as provided in the applicable union codes, and Grantor (and Artist) agree to complete any documentation required by the applicable union to effectuate the terms of this sentence.

6.02     Any monies paid to Grantor or Artist during the Term and any monies paid by R N D on Grantor's of Artist's behalf or at Artist's or Grantor's direction, other than royalties paid pursuant to this agreement shall be deemed Advances.

6.03     All out of pocket expenditures by R N D or its licensees relating to Records hereunder, including, without limitation, costs of video productions and independent promotion, shall be deemed Advances.

7.ROYALTIES

R N D shall accrue to the account of grantor in accordance with the provisions of Article 8 below the following royalties for the sale of phonograph records derived from Master Recordings hereunder provided, however no royalties shall accrue(except for accounting purposes) or be due and payable to Grantor until such time as all Advances, as defined in Article 6 above, have been recouped by or repaid to R N D:

7.01    (a) A royalty of eight (8%) of the Royalty Base for Net Sales of all Singles sold by R N D for distribution through Normal Retail Channels in the United States.

(b) A royalty of ten (10%) of the Royalty Base for Net Sales of all EP's sold by R N D for distribution through Normal Retail Channels in the United States.

7.02    A royalty of fifteen (15%) of the Royalty Base for Net Sales of all Albums sold by R N D for distribution through Normal Retail Channels in the United States.

(a) The Royalty Base for net sales of all Albums sold by R N D for distribution through normal retail channels in the United States will change to eighteen (18%) when a total of one (1) million soundscan copies are sold.

(b) The Royalty Base for net sales of all Albums sold by R N D for distribution through normal retail channels in the United States will change to eighteen (23%) when a total of three (3) million soundscan copies are sold.

7.03    The royalty rate with respect to Net sales of Records sold for distribution outside the United States shall be fifty percent (50%) of the otherwise applicable basic royalty rate set forth in paragraph 7.01, 7.02, 7.02(a), or 7.02(b) hereof.

7.04    With respect to Net Sales of Records sold in the form of compact discs or record configurations not specifically provided for herein, R N D shall have the option to accrue, at its sole discretion, request to each such Record, either a royalty to equal to the same dollars-and-cents (or other currency) royalty amount as would otherwise be accrued hereunder with respect to an equivalent Record in the form of an analog cassette, or a royalty computed at the same percentage of the Royalty Base of such compact disc or other Record configuration as the percentage of the Royalty Base utilized to compute the royalty for an equivalent Record in the form of analog cassette. For purposes of this paragraph only, the term "configuration not specifically provided for herein" means configurations other than vinyl disc, analog cassette, compact disc, CD/Video, Audio-Visual Devices and compact disc interactive.

7.05    (a) The royalty for net Sales of Long-Play Singles shall be accrued at one-half (1/2) of the otherwise applicable Singles royalty rate and shall be computed based on the particular Royalty Base of each such Long-play Single.

(b) The royalty for Net sales of premium Records, budget Records, Records sold in Armed Forces Post Exchanges, multiple-Record Albums, special configuration Singles (i.e.., singles and/or long-play Singles sold at two for the price of one, manufactured in colored vinyl and/or sold with a four-color poster included) or records other than Albums not otherwise specifically referred to herein shall be accrued at one-half (1/2) of the otherwise applicable royalty rate and shall be computed based on the particular Royalty base of each such Record.

7.06   (a) With respect to the following Records and/or exploitation of Master Recordings, the royalty to be accrued hereunder shall be a sum equal to fifty percent (50%) of R N D's net receipts with respect to such exploitation: (i) Records derived from Master Recordings hereunder sold through non-Affiliated Third Party record clubs or similar sales plans operated by Non-Affiliated Third Parties; (ii) licenses of Master Recordings to Non-Affiliated Third Parties for sales of Records by such licensees through direct mail order or in conjunction with TV or radio advertising, including through methods of distribution such as "key outlet marketing" (distribution through retail fulfillment centers in conjunction with special advertisement on radio or television), or by any combination of the methods set forth above or other methods; (iii) licenses of Master Recordings on a flat- fee or other royalty basis; (iv) licenses to Non-Affiliated Third Parties for promotional or commercial use of Audio-Visual Recordings described in paragraph 5.02, excluding blanket licenses to exploit R N D. Recordings for Background music, synchronization in motion pictures and television soundtracks and Records derived therefrom and released by Non-Affiliated Third Parties, and/or use on transportation facilities.

(b) The terms "net receipts" and "net amount received" and terms in this paragraph 7 shall mean amounts received by R N D in connection with the subject matter thereof which are solely attributable to the Master Recordings hereunder (excluding catalog and/or administrative fees payable to R N D for the licensing of Audio-Visual Recordings hereunder), after deduction of any costs or expenses or amounts which R N D is obligated to pay to third parties (such as, without limitations, production costs, mechanical copyright payments, AFofM and other union or guild payments).

7.07   As to net Sales of Records derived from master Recordings hereunder sold through R N D's affiliated record clubs or similar sales plans operated by parties affiliated with R N D. Grantor shall receive a royalty equal to three percent (3%) of eighty-five percent (85%) of the Royalty Base of such Records. No royalty shall be payable with respect to Records distributed to members of record clubs as "Bonus" or 'Free" Records as a result of joining the club, and/or recommending that another join the club and/or purchasing a required number of Records.

7.08   (a) As to Net Sales by R N D or its affiliated licensees of records derived from Master Recordings by direct mail, mail order or in conjunction with radio or TV advertising, including through methods of distribution such as "key outlet marketing",

or by any combination of such methods, the royalty to be accrued hereunder shall be a royalty of three percent (3%) of the Royalty Base for Net Sales of such Records.

(b) Not withstanding the foregoing, in the event R N D or any of its affiliated licenses in a particular country utilize television and/or radio advertising in conjunction with a television campaign to promote its sales Records derived from Master Recordings hereunder, then the royalty to be accrued hereunder with respect to Net Sales of such Records sold by R N D or the particular affiliated licensee in such country during the semi-annual accounting period in which the first such advertisement is broadcast through the end of the semi-annual accounting period in which the last such advertisement is broadcast, shall be fifty percent (50%) of the otherwise applicable royalty rate set forth in paragraph 7.01, 7.02, 7.02(a), 7.02(b) or 7.03 above.

7.09   If any Recordings made hereunder embody Artist's performances together with the performances of any other Persons to whom R N D is obligated to pay royalties, then the royalty due hereunder for such joint performances shall be the royalty provided for herein divided by the number of royalty-earning artists participating therein including Artist.

7.10   As to Records not consisting entirely of Master Recordings delivered hereunder, the royalty to be accrued hereunder shall be pro-rated on the basis of the number of Master Recordings hereunder which are on such Records compared to the total number of Master Recordings on such Records.

7.11   (a) With respect to Net Sales of Audio-Visual Devices sold by R N D for distribution in the United States, a royalty of ten percent (10%) of the applicable Royalty Base.

(b) With respect to Net Sales of Audio-Visual Devices sold by R N D and/or its affiliates for distribution outside of the United States, a royalty of five percent (5%) of the applicable Royalty Base.

(c) With respect to Net Sales of Budget Videos the otherwise applicable royalties provided for in this paragraph 7.11 shall be reduced in the same proportion as Record royalties are reduced for sales of Budget Records pursuant to paragraph 7.05 above.

7.12   (a) With respect to Net Sales of Records sold by R N D for distribution in the United States in the form of CD/Videos, a royalty of ten percent (10%) of the applicable Royalty Base.

(b) With respect to Net Sales of Records sold by R N D and/or its affiliates for distribution outside the United States in the form of CD/Videos, a royalty of ten percent (10%) of the applicable Royalty Base multiplied by a fraction, the numerator of which is the royalty rate set forth in this agreement for Net Sales of disc Album sold by

R N D for distribution in the applicable country, and the denominator of which is the royalty rate set forth in this agreement for Net Sales of disc Albums sold by R N D for distribution in the United States.

    7.13   R N D represents that if any Recording hereunder is mixed in the so-called "Q-sound" format (which R N D agrees that, during the term hereof, it shall not so mix without Grantor's prior consent), R N D shall be obligated to pay to the third party providing the technology for recording in such "Q-sound" format a royalty (the "Q-sound") on all sales of Records (except vinyl discs) embodying such Recording. The "Qsound" Royalty is equal to one percent (1%) on a retail base on sales through Normal Retail Channels, and is a lesser amount on other sales an amount equal to the Q-sound Royalty, it being expressly understood and agreed that the Q-sound royalty paid by R N D to such third party shall be deducted from any and all royalties otherwise to be accrued to Grantor hereunder.

## 8. ACCOUNTINGS

    8.01   Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made by R N D to Grantor on or before December 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as R N D may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by Grantor during such preceding half-year, less Advances or other recoupable and/or deductible amounts hereunder. R N D shall have the right to hold reasonable reserves in respect of sales hereunder.

    8.02   Royalties for Records sold for distribution outside the United States shall be computed in the same national currency as R N D is accounted to by its licensees and shall be paid at the same rate of exchange as R N D is paid, and shall be subject to any taxes applicable to royalties on Records sold outside the United States shall not be due and payable by R N D until payment therefor has been received by R N D in the United States in United States Dollars, and shall be required to accept payment in a foreign country or in foreign currency, R N D shall deposit to the credit of Grantor (at Grantor's request and expense), in such currency in a depository in the country in which R N D is required to accept payment, Grantor's share of royalties due and payable to Grantor with respect to such sales. Deposit as aforesaid shall fulfill the obligations of R N D as to Record sales to which such royalty payments are applicable. If any law, government ruling or any other restriction affects the amount of the payments which. R N D licensee can remit to R N D may deduct from Grantor's royalties an amount proportionate to the reduction in such licensee's remittances to R N D.

    8.03   All royalty statements rendered by R N D to Grantor shall be binding upon Grantor and not subject to any objection by Grantor for any reason unless specific objection in writing, stating the basis thereof, is given to R N D within one (1)

year from the date due. Failure to make a specific objection within said time period shall be deemed approval of such statement.

8.04     (a) Grantor shall have the right at Grantor's own expense to audit R N D's books and records only as the same pertain to distribution under this agreement for the two (2) accounting periods prior to such audit. Grantor may make such an examination for a particular statement only once, and only within one (1) year after the date when R N D required to send Grantor said statement under paragraph 8.01. Such audit shall be conducted during R N D's usual business hours, and at R N D's regular place of business in the United States where R N D keeps the books and records to be examined. Such audit shall be conducted by an independent certified public accountant. If such accountant of his or her firm has begun an examination of R N D books and records for another party or pursuant to an agreement other than this agreement, the examination on Grantors behalf shall not be undertaken until such other examination is concluded and any applicable audit issues relating to such other examination have been resolved.

(b) Grantor acknowledges that R N D books and records contain confidential trade information. Neither Grantor nor its representatives shall at any time communicate to others or use on behalf of any other Person any facts or information obtained as a result of such examination of R N D books and records.

8.05     Grantor will not have the right to bring an action against R N D in connection with any royalty accounting or payments hereunder unless Grantor commences the suit within one (1) year from the date such statement of accounting for royalties or such payment was due. If Grantor commences suit on any controversy or claim concerning royalty accountings rendered by R N D under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Grantor's recovery of any such royalties of any claim related to R N D royalty accountings. Without limiting the generality of the preceding sentence, neither Grantor (nor Artist) will have any right to seek termination of the Tern of this agreement or avoid the performance of their obligations under it by reason of any such claim.

8.06     Grantor hereby authorizes and directs R N D to withhold from any monies due Grantor from R N D any part thereof required by the United States Internal Revenue Service and/or any other government authority to be withheld, and to pay same to the United States Internal Revenue Service and/or such other authority. No advances or other payments shall be made pursuant to this agreement until Grantor has completed the Internal Revenue Service Form attached as Exhibit "B".

## 9. MECHANICAL COPYRIGHT LICENSES

9.01     The following provisions shall pertain to Controlled Compositions:

(a) Each Controlled Composition shall be and hereby is licensed to R N D in the United States and Canada at a copyright royalty rate equal to seventy-five percent (75%) of the Statutory Rate prevailing at the time of commencement of recording of the Master Recording embodying such Controlled Composition, subject to the provisions of this Article 9. With respect to Records sold and/or distributed in the manner described in paragraphs 7.05, 7.06, 7.07, or 7.08, the copyright royalty rate with respect to Controlled Compositions shall be three-fourths (3/4).of the rate set forth in the preceding sentence.

(b) Copyright royalties with respect to Controlled Compositions shall be payable only on Net Sales hereunder. Copyright royalties shall not be payable with respect to Records otherwise not Royalty-bearing hereunder or with respect to Compositions which are in the public domain or are arranged versions of Compositions in the public domain or for non-musical material

(c) Notwithstanding anything to the contrary contained herein, if any Record hereunder embodies more than one (1) Master Recording of a particular Controlled Composition, then R N D shall be obligated to pay the copyright royalty rate(s) referred to in paragraph 9. 0 l(a) with respect to only one (1) such Master Recording.

(d)    (i) Grantor hereby licenses to R N D each Controlled Composition embodied in any Audio-Visual Recording for such Recording and uses thereof without payment;

(ii) Grantor shall procure for R N D an irrevocable written consent, by the copyright proprietor of each non-Controlled Composition embodied in any Audio-Visual Recording, to such recording and uses thereof without payment.

(e) The provisions of this Article 9 shall constitute and are accepted by Grantor, on Grantor's own behalf and on behalf of any other owner of any Controlled Composition(s) or of any rights herein, as full compliance by' R N D with all of its obligations under the compulsory license provisions of the applicable copyright law, arising from any use by R N D of Controlled Compositions as provided for herein, and shall constitute a mechanical license. R N D shall have the right to hold reasonable mechanical royalty reserves in respect of sales hereunder. Mechanical royalty reserves maintained by R N D against anticipated returns and credits shall not be held for an unreasonable period of time; retention of a reserve for two years after it is established shall not be considered unreasonable in any case. If R N D makes any overpayment of mechanical royalties on Controlled Compositions (including without limitations, be means of an accounting error or by paying mechanical royalties on Records returned), R N D shall have the right to demand reimbursement of such excess from Grantor (and Grantor shall immediately make such reimbursement) and/or the right to deduct the amount of such overpayment from any and all monies due hereunder. R N D shall account for mechanical royalties on a quarterly basis. Grantors right to audit R N D's books and records as the same relate to copyright royalties for Controlled Compositions shall be

subject to the terms and conditions set forth in Article 8 in connection with Grantor's audit rights.

(f) Any assignment made of the ownership or copyright in any Controlled Composition shall be made subject to the provisions of this Article 9.

9.02   Notwithstanding anything to the contrary contained herein, Grantor warrants, represents, and agrees that, in the United States and Canada, R N D shall have no obligation whatsoever to pay an aggregate copyright royalty rate in respect of any Record hereunder regardless of the number of Controlled Compositions contained thereon, in excess of the following sums:

(a) In respect of an Album or twelve-inch CD/Video: ten (10) times the applicable amount set forth in paragraph 9.01 above.

(b) In respect of a Single, EP Record, Long Play Single or any Record other than as expressly provided for in this paragraph 9.02: two (2) times the applicable amount set forth in paragraph 9.01 above.

(c) In respect of a five-inch CD/Video: three (3) times the applicable amount set forth in paragraph 9.01 above.

(d) In respect of an eight-inch CD/Video: five (5) times the applicable amount set forth in paragraph 9.01.

9.03   Without limitation of the generality of clause 9.02 above, if the aggregate of copyright royalties in respect of any Records hereunder exceeds the applicable amounts set forth in this Article 9, then, without limitation of R N D's rights, R N D shall have the right to demand reimbursement from Grantor of such excess and/or to deduct the amount of such excess from payments due hereunder, including copyright royalties.

9.04   If any Recordings made under this agreement contain copyright Compositions which are not available to R N D under compulsory license, Grantor will obtain mechanical licensees covering those Compositions for R N D's benefit on the some terms applicable to Controlled Compositions hereunder unless R N D agrees otherwise.

10. GRANTOR'S ADDITIONAL WARRANTIES AND REPRESENTATIONS

Grantor warrants and represents the following:

10.01  (a) Grantor is authorized, empowered and able to enter into and fully perform its obligations under this agreement. Neither this agreement nor the fulfillment thereof by any party infringes upon the rights of any Person. Grantor owns and

controls, without any limitations, restrictions or encumbrances whatsoever, all rights granted or purported to be necessary licenses and permissions as may be required for the full and unlimited exercise and enjoyment by R N D of all of the rights granted and purported to be granted to R N D herein. R N D will own, possess and enjoy such rights without any hindrance on the part of any Person, firm or entity whatsoever.

(b) There is in existence between Grantor and Artist a valid and enforceable agreement Pursuant to which Artist is required to perform exclusively for Grantor during the Term. Grantor will waive none of its rights under such contract and shall take all steps necessary or desirable to keep the same in full Artist's exclusive services as if Artist had contracted hereunder directly with R N D. Simultaneously with the execution of this agreement, Grantor shall deliver to R N D an agreement between R N D and Artist in the form annexed hereto as Exhibit "A"; Grantor hereby gives its consent and approval to the contents thereof and said Exhibit "A" is hereby made a part hereof. Grantor will require full and complete performance by the Artist of such contract. If Artist breaches such contract, Grantor will immediately notify R N D in writing of the details of such breach. If Grantor does not enforce any of Grantor's rights under its contract, R N D may without limitation of R N D rights, enforce such rights in Grantor's name and/or the name of R N D . In addition to the foregoing, R N D may exercise, in Grantor's stead, Grantor's right to seek injunctive relief against Artist for Artist's breach of Artist's obligations to provided personal services pursuant to the Agreement between Grantor and Artist. It is the mutual intention of R N D and Grantor that the rights granted herein specifically but without limitation be a grant of rights to receive injunctive relief pursuant to the provisions of California Civil Code Section 3423 (Fifth) and California Code of Civil Procedure Section 526 (second paragraph 5) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

(c) Grantor is an individual. The party executing this agreement on behalf of Grantor is an authorized representative of Grantor, duly authorized to sign on Grantor's behalf.

(d) Grantor has no knowledge of any claim or purported claim which interfere with R N D's rights hereunder or create any liability on the part of R N D.

10.02 There now exist no prior unreleased recorded performances by Artist.

10.03 The Master Recordings hereunder and performances embodied thereon shall be produced in accordance with the rules and regulations of the American Federation of Musicians and the American Federation of Television and Radio Artists and in accordance with the rules and regulation of all other unions having jurisdiction. Artist is or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be required for the performance of Artist's services hereunder.

10.04  Artist will perform exclusive services hereunder. Artist will not perform for (or license, or consent to, or permit the use by any Person other than R N D of Artist's name or likeness for or in connection with) the recording or exploitation of any Phonograph Record (including, without Nations any Audio-Visual Device) embodying any Composition recorded by Artist under this agreement to the date of delivery to R N D of the Master Recording embodying that Composition hereunder, or the date three (3) years subsequent to the expiration or termination of the Term.

10.05  Neither Master Recordings hereunder nor the performances embodied thereon, nor other Materials, as hereinafter defined, nor any use thereof by R N D or its grantees, licensees or assigns will violate or infringe upon the rights of any third party. "Materials," as used in this paragraph, means: all Controlled Compositions; each name or sobriquet used by Artist or Grantor, individually or as a group; and all other musical dramatic, artistic, and literary materials, ideas, and other intellectual properties furnished or selected by Grantor, the Artist or any producer and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

10.06  Grantor shall be solely responsible for and shall pay all sums due Artist, and the individual producer of the Sides, and all other Persons entitled to receive royalties or any other payments in connection with the sale of Phonograph Records derived from Master Recordings hereunder, and the royalties set forth in Article 7 hereof include all monies due all such parties.

10.07  (a) Artist shall be available from time to time to appear for photography, poster and cover art, and the like, under the direction of R N D or its nominees and to appear for interviews with representatives of the communications media and R N D publicity personnel.

(b) Artist shall be available from time to time at R N D's request to perform for the purpose of recording for promotional purposes by means of film, videotape, or other audio-visual media performances of Compositions embodied on Master Recordings hereunder.

10.08  Neither Grantor nor Art shall authorize or knowingly permit the Artist's performance to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Records in violation of the restrictions herein, and Grantor and Artist shall take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than R N D of such Records. Neither Grantor, nor any Person deriving any rights from Grantor, shall use or authorize or permit any Person other than R N D to use Artist's name (including picture, portrait or caricature), autograph (including facsimile signature), or biography in connection with the manufacture and/or exploitation of Master Recordings or Records.

10.09   Neither Grantor nor Artist, nor any Person deriving any rights from Grantor shall at any time, do, or authorize any Person to do, anything inconsistent with, or which might diminish or impair, any of R N D's rights hereunder. Neither Artist nor Grantor shall endorse any products whose use would be detrimental to the Phonograph Record industry, including but not limited to, blank tapes and tape recording equipment.

10.10   Grantor agrees to and does hereby indemnify, save and hold harmless of and from any and liability, loss, damage, cost or expense (including attorney's fees) arising out of or connected with any breach or alleged breach of this agreement of any claim which is inconsistent with any of the warranties or representations made by Grantor in this agreement, and agrees to reimburse R N D on demand for any payment made or incurred by R N D with respect to any of the foregoing. Pending final determination of any claim involving such alleged breach or failure, may withhold sums due Grantor hereunder.

10.11   Grantor warrants and represents that, as of the date hereof neither Grantor nor any member of Artist is a resident of the State of California. Grantor shall notify R N D immediately in the event that Grantor and/or any member of Artist becomes a resident of the State of California.

11. FAILURE OF PERFORMANCE

11.01   R N D reserves the right by written notice to Grantor to suspend the operation of this agreement and its obligations hereunder for the duration of any contingencies by reason of which R N D is materially hampered in its recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impracticable: for example, labor disagreements; fire; catastrophe; shortage of materials; or any cause beyond R N D control . A number of days equal to the total of all such days of suspension may be added to the Contract Period in which such contingency occurs and the dates for the exercise by R N D of its options as set forth in Article 1, the dates of commencement of subsequent Contract periods and the Term shall be deemed extended accordingly.

11.02   If in respect of any Contract Period R N D, except for reasons set forth in paragraph 11.01 above, refuses without cause to allow Grantor to fulfill the Minimum Recording Obligation for such Period, and if no later than thirty (30) days after that refusal takes place, Grantor notifies R N D in writing of Grantor's desire to fulfill such Minimum Recording Obligation, then if R N D does not allow Grantor either to record sufficient Master Recordings to fulfill the Minimum Recording Obligation within sixty (60) days of receipt of such notice, or to commence recording of such Recording obligation if it cannot be recorded within said sixty (60) days, the Term of this agreement shall "terminate upon the expiration of such sixty (60) day period. Upon such termination of the Term of this agreement all parties shall be deemed to have fulfilled all of their obligations hereunder except for those obligations which survive the end of the Term such as warranties,

re-recording restrictions, and the obligation to accrue and pay royalties, if payable, and R N D shall pay union scale for the Minimum Recording Obligation not fulfilled for the applicable Period of the Term in full settlement of its obligations in connection therewith, less any and all Advances previously paid by R N D, with respect to such unrecorded Master Recording(s), payment shall constitute an Advance hereunder. This shall be Grantor's sole remedy in connection with R N D failure to allow Grantor to fulfill the Recording Obligation. If Grantor shall fail to give notice to R N D within the period specified therefor, R N D shall be under no obligation for its failure to allow Grantor to fulfill such Minimum Recording Obligation.

## 12. ADDITIONAL REMEDIES

12.01   Without limitations of any other rights and remedies of R N D if Grantor- fails to record and deliver Recordings in accordance with Articles 3 and 4, then R N D may at its election, suspend its obligations hereunder for a number of days equal to the number of days between the last date on which Grantor is scheduled to deliver Master Recordings and the date on which Grantor actually delivers such Master Recordings, in which event the then current Contract Period, the date for exercise of R N D's options to extend the Term, the dates of commencement of subsequent Recordings, in which event the then current Contract Period, the date for exercise of R N D's options to extend the Term, the dates of commencement of subsequent Contract Periods, and the Term may be extended accordingly. If such failure exceeds ninety (90) days, in addition to its other rights and remedies, R N D may, at its election, demand reimbursement from Grantor of all monies theretofore paid, including, without limitations any monies paid pursuant to paragraph 6.01 above, with respect to the applicable Master Recordings (and Grantor shall immediately make such reimbursement) and/or deduct such costs from any payments to be made hereunder and/or terminate this agreement by written notice to Grantor and upon such termination R N D shall have no obligations to Grantor hereunder except the obligation to pay royalties, if payable.

12.02   Without limiting any other rights of R N D it is specifically understood and agreed that in the event of Grantor's dissolution of the liquidation of Grantor's assets, or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization by, for or against Grantor, or in the event of the appointment of a receiver or a trustee for all or a portion of Grantor's property, or if Grantor shall make an assignment for the benefit of creditors or commit any act for or in bankruptcy or become insolvent or if Grantor shall fail to fulfill its obligations under this agreement or to require that Artist render to terminate the Term of this agreement or to require that Artist render Artist's personal services directly to R N D for the remaining balance of the Term upon all the same terms and conditions as are herein contained. In such event the agreement as of the date of R N D's, option exercise, and, in respect of Master Recordings recorded subsequently, the royalties and any Advances payable hereunder shall be reduced to two-thirds of the amounts prescribed in this agreement.

12.03   If Artist notifies R N D that Artist will no longer render services to Grantor as required by R N D, other than for the reasons set forth in paragraph 12.02 above, then R N D shall have the same options as set forth in such paragraph 12.02, except that, at R N D's election, in lieu of the provisions of the last sentence of paragraph 12.02, R N D may withhold payments to Artist and Grantor pending settlement of any disputes between Grantor and Artist with respect to the subject matter hereof and/or divide payments to Grantor hereunder between Artist and Grantor in the manner Grantor shares such payments with Artist under its contract with Artist and Grantor shall be withheld by R N D.

12.04   It is records and Grantor's agreement with Artist shall acknowledge, that Artist's services are of special unique, unusual extraordinary and intellectual character involving skill of the highest order which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as any breach of this agreement (and/or Grantor's agreement) with respect to such services would cause R N D irreparable damage, R N D shall be entitled to injunctive and other equitable relief, in addition to whatever legal remedies are available to R N D, to prevent or cure any such breach or threatened breach.

12.05   The rights and remedies of R N D as specified in this agreement are not to the exclusion of each other or of any other rights or remedies of R N D; R N D may decline to exercise any one or more of its rights and remedies as R N D may deem fit, without rights and remedies in connection with this agreement shall survive the specific rights granted to R N D anywhere in this agreement, R N D may at any time exercise any right which it now or at any time hereafter may be entitled to as a member of the public as thought this agreement were not in existence.

## 13. DEFINITIONS

13.01  "Master", "Recording", "Master Recording":  Any  recording  of sound, whether or not coupled with a visual image, by any method and on any substance or material whether now or hereafter known, including Audio-Visual Recordings, intended for reproduction in the form of Phonograph Records, or otherwise.

13.02  "Record", Phonograph Records":   Any device now or hereafter known, on or by which sound may be recorded and reproduced, which is manufactured or distributed primarily for home and/or consumer and/or jukebox use and/or use on or in means of transportation including "sight and sound" devices or Audio-Visual Devices.

13.03  (a)   "Audio-Visual Devices":   All forms of reproductions of Audio-Visual Recordings, excluding CD/Video, now or hereafter known, manufactured or distributed primarily for home and/or jukebox use and/or use on or in means of transportation.

(b)    "Audio-Visual Recordings": means    every    form    of recording embodying performances of artist wherein are fixed visual images, whether of Artist or otherwise, together with sound.

13.04  (a)    "Side":    A Recording of sufficient playing time to constitute one (1) side of a 7 inch, 45 rpm disc Phonograph Record, but not less than two and one-half (2 1/2) minutes of continuous sound, embodying performances of Artist.

(b)    "Single":    A 7 inch, 45 rpm Phonograph Record or equivalent embodying thereon at least one (1) Side, and expressly including a compact disc or pre-recorded tape embodying the same two (2) Sides on each of side "A" and side "B".

(c)    "Album":    One or more LPs, sold in a single package (an Album of more than one LP sometimes being referred to as a "Multiple-Record Album").

(d)    "LP":    A 12 inch, 33 1/3 rpm or 45 rpm, double-sided long play disc Phonograph Record or equivalent embodying thereon five (5) or six (6) Sides and not less than twenty (20) minutes of playing time.

(f)    "Long Play Single":    A 12 inch 33-1/3 rpm or 45 rpm double-sided long play disc Phonograph Record or equivalent usually embodying three (3) or four (4) Sides.

(g)    "CD/Video":    A phonograph Record in laser-read compact disc form embodying Audio-Visual Recordings, which may, without limitation, include additional audio only sides.

(h)    As used herein, the phrase "or equivalent" shall mean every form of prerecorded tape, compact disc or any other Record equivalent.

13.05  (a)    "Base Price": With respect to Records other than Audio-Visual Devices and CD/Videos, the base Price is the "Retail List Price," defined as R N D's suggested retail list price (or the equivalent price category) in the United States for records sold in the United States, and, with respect to Records sold outside the United States, an equivalent of or substitute for an actual or hypothetical retail price ("Retail-related Base") as may be established by R N D or its licensee(s) in conformity with the general practice of the Record industry in such country, or otherwise, provided that R N D may but shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency as the basis for the collection of mechanical copyright royalties. Notwithstanding anything to the expressed or implied in the preceding sentence, it is understood and agreed that if a Retail-related Base cannot be established in a particular country, the Base Price shall be that amount equal to the lowest wholesale price payable by the largest category or R N D's customers in the normal course of

business with respect to such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred twenty six percent (126%), provided however, that if a published price to dealers ("ppd") exists in the applicable country of sale then R N D may apply the ppd in lieu f the lowest wholesale price.

(b) With respect to Records in the form of Audio-Visual Devices, the base Price is the lowest wholesale price payable by the largest category of R N D's or its licensees customers in the normal course of business with respect to such Records sold for distribution during the applicable semi-annual accounting period, provided however, that if a published price to dealers may apply the ppd in lieu of the lowest wholesale price.

(c) With respect to Records in the form of CD/Video the Base Price shall be the lowest wholesale price payable by the largest category of R N D or its licensees customers in the normal course of business with respect to such Records sold for distribution during the applicable semi-annual accounting period, less thirty-five (35%) percent of such lowest wholesale price, provided however, that if a published price to dealers ("ppd") exists in the applicable country of sale then R N D may apply the ppd in lieu of the lowest wholesale price. No Container Charge or automatic free goods (as set forth in paragraph 13.15 (a)(ii) below) shall apply in respect of CD/videos.

13.06 "Container Charge":   Twelve and one-half percent (12 1/2) of the Retail List Price for a sin- fold disc Album in a standard sleeve with no inserts, a Long-Play disc Single or for a disc Single; fifteen percent (15%) of the Retail List Price for a jacket or with inserts; twenty percent (20%) of the Retail List Price for a pre-recorded analog tape and twenty-five percent (25%) of the Base Price for compact discs (unless R N D applies the dollar-and-cents royalty provisions of paragraph 7.04 (a) or for any other Record (excluding Audio-Visual Devices and CD/Video) other than as expressly provided for in this paragraph 13.06.

13.07 (a)   "Royalty Base":   The Base Price less all excise, sales and similar taxes and less the applicable Container Charges, if any.

(b)   R N D may at any time and from time to time change the method by which it computes royalties in the United States from a retail basis to some other basis (the "New Basis"), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Royalty Base and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars-and-cents royalty amounts payable with respect to the top-line product through Normal Retail Channels as of the date of such change would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate shall be reduced in the ratio of the royalty rate for such sales to the royalty rates for sales of top-line product. If there are other adjustments made by R N D that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of

free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration into consideration in adjusting the royalty rate.

(c)     Notwithstanding anything to the contrary contained herein, the Royalty base for premium Records shall at R N D's election be R N D's actual sales price of such Records.

13.08 "Recording Cost":     All costs including preproduction and post-production costs incurred for and with respect to the production of Master Recordings. Recording Costs include without limitation, union scale; payments for musicians, vocalists, conductors, arrangers, orchestrators, copyists, etc.; payments required by an agreement between R N D and any labor organization producer's fees; studio charges; costs of tape, editing, mixing, mastering to tape, reference discs, and engineering; expenses of travel per diems and rehearsal halls; costs of non-studio facilities and equipment; dubbing; costs and transportation of instruments including cartage and rental fees; and other costs and expenses which are customarily recognized as recording costs in the Phonograph record industry.

13.09 "Composition": A musical composition or medley consisting of words and/or music, or any dramatic material whether in the form of instrumental and/or vocal music, prose or otherwise, irrespective of length.

13.10 "Controlled Composition":     Any Composition wholly or partly written, composed, owned or controlled directly or indirectly by Artist and/or Grantor and/or any individual producer of Master Recordings and/or any Person affiliated with one or more of the foregoing or in which one or more of the foregoing has a direct or indirect interest.

13.11 "Advance":     An "Advance" constitutes a prepayment of royalties and shall be charged against and shall be recoupable from all royalties accruing hereunder.

13.12  (a)     "Budget Records":     Albums sold in a particular country at a Base Price which is eighty percent (80%) or less of the Base Price in such country for top-line single-LP Albums.

(b)     "Budget Videos":     Audio-Visual Devices or CD/Videos sold in a particular country at Base Price which is eighty percent (80%) or less of the Base Price in such country for top-line Audio-Visual Devices or CD/Videos, as applicable.

13.13 "Person":     Any individual corporation, partnership, association, or other entity, or the legal successors or representative of any of the following.

13.14 "Non-Affiliated Third Parties": persons other than as to which R N D now or hereafter directly or indirectly holds at least a fifty percent (50%) interest or

control (including joint ventures) or Persons in which the principals of R N D now or hereafter collectively hold at least a fifty percent (50%) interest or control.

13.15 "Net Sales":   Sales Of Records hereunder, paid for, less returns and credits. Net Sales shall specifically exclude the follow:

(a)   (i) Records given away gratis or sold for fifty percent (50%) or less of the Gross Price (as hereinafter defined); records distributed for publicity, advertising or promotional purposes to disc jockeys, radio or television stations, publishers, distributors, dealers, consumers, or others and Records sold as cutouts., surplus or for scrap.

(ii) Free or bonus Records given away together away together with Records sold for monetary consideration (sometimes referred to as "free goods") The number of Records automatically deemed not sold for royalty purposes under this paragraph 13.15 (a)(ii) shall not exceed R N D's standard discount limitation in effect at the time of shipment of the particular Records, which as of the date of this agreement R N D represents is for Singles and Long-Play Singles, 23.08% of the gross total distributed and, for Albums, 15% of the gross total distributed.

(iii) Free or bonus Records given away pursuant to special sales plans in additions to free goods.

(iv) To the extent that Records hereunder are sold subject to a sales plan entailing a selling price for such Records reduced by a percentage discount from R N D or its or its licensee's "Gross Price" *(i e., the selling price to distributors before any discounts or free goods or bonus plans), the number of such Records deemed to be Net Sales shall be determined by reducing the number of Records actually sold by the percentage of discount granted applicable to such sale.

(b)   Without limitation of the generality of paragraph 13.15(a) above, R N D shall have the right to deduct from the number of records sold returns and credits of any nature, including without limitation: (i) those on account of any return or exchange privilege; (ii) defective merchandise; and (iii) errors in billing or shipment, provided that returns shall be pro-rated between royalty-bearing and non-royalty bearing Records on the assumption that such Records were shipped pursuant to R N D  standard basic sales plan as described in subparagraph 13.15(a)(ii) above.

(c)   Without limitation of the foregoing, royalties shall not be payable with respect to distributions which are not Net Sales and the terms "Net Sales" and/or "net royalty-bearing *sales"* shall not include the sales described in paragraphs 13.15(a) and 13.15(b) and shall not include any sales which are being held as royalty reserves.

13.16 "Normal Retail Channels":   Normal Retail distribution channels excluding sales of Records described in paragraphs 7.05, 7.06, 7.07, 7.08, 7.09, 7.10, 7.11 and 7.12 herein.

13.17 "Contract Period":   The Initial Period or an Option Period as defined in Article 1 above.

13.18 "Statutory Rate":   The minimum statutory compulsory license rate applicable to a Composition of less than five (5) minutes under the copyright laws of the United States. On Records sold in Canada, the prevailing rate agreed upon by the Canadian recording industry and the Canadian music publishing industry or its mechanical collection representative which is applicable to the reproduction of musical compositions, provided however, in no event shall the Canadian Statutory Rate be greater than the United States Rate.

13.19 "Armed Forces Post Exchanges":   united States military posts, ships' stores or other United States armed forces facilities, including, without limitations federal state and/or local governments.

## 14. MISCELLANEOUS

14.01   Wherever Grantor's approval or consent is required, Grantor's consent is required, Grantor shall give R N D written notice of approval or disapproval (the reasons for such disapproval being specifically stated) within five (5) business days after R N D requests same. If Grantor shall fail to give such notice to R N D aforesaid, Grantor shall be deemed to have given such consent fail to give such notice to or approval.

14.02   Any promotional efforts or expenditures made by Grantor or by any Person on behalf of Grantor in connection with any Records hereunder shall be in accordance with applicable legal standards, including Sections 317 and 508 of the Communications Act of 1934, as amended. In the event Grantor is in breach of the preceding sentence, R N D may, without limiting its rights, terminate the Term of this agreement.

14.03   Grantor recognizes that the sale of Records is speculative and agrees that the judgment of R N D with regard to any matter affecting the sale, distribution and exploitation of Records hereunder shall be binding and conclusive upon Grantor. Nothing contained in this agreement shall obligate R N D to make, sell license, or distribute Records manufactured from the Sides hereunder other than as specifically provided herein. The method, manner and extent of release, packaging, promotion, advertising, distribution and exploitation of master Recordings and Records shall be within the sole discretion of R N D unless otherwise herein specifically provided.

14.04   R N D may, at its election, assign this agreement or any of its rights hereunder.

14.05   All notices required to be given to R N D shall be sent to R N D at its address first mentioned herein and all royalties, royalty statements and payments and any and all notices to Grantor shall be sent to Grantor at its address first mentioned herein, or such other address as each party respectively may hereafter designate by notice in writing and, except for royalty statements shall be sent by registered or certified mail return receipt requested, and the day of mailing of any such notice shall be deemed the date of the giving thereof(except notices of change of address, the date of which shall be the date of receipt by the receiving party). All notices to R N D shall be served upon R N D to the attention of the Senior Vice President, Business Affairs.

14.06   It is expressly understood and agreed that, in the event of a breach or purported breach by R N D hereunder, Grantor's rights shall be limited to an action at law for money damages, if any, actually suffered by Grantor as a result thereof and in no event shall Grantor be entitled to recession injunction or other equitable relief of any kind. Moreover, Grantor shall not be entitled to recover damages or to terminate the Term of this agreement by reason of any breach by R N D of its material obligations hereunder, unless R N D has failed to remedy such breach within a reasonable time following receipt of Grantor's notice thereof.

14.07   This agreement is entered into in the State of Texas and shall be construed on accordance with the laws of Texas applicable to contracts entered into and to be wholly performed therein. The parties agree that any action, suit or proceeding based upon any matter, claim or controversy arising hereunder or relating hereto shall be brought solely in the State Courts of or the Federal Court in the State and County of Texas; except that in the event R N D is sued or joined in any other court or in any other forum in respect of any matter which may give rise to a claim by R N D hereunder, the parties hereto other than R N D consent to the jurisdiction of such court or forum over any claim which may be asserted by R N D therein. The parties hereto irrevocably waive any objection to the venue of the above-mentioned courts, including any claim that such action, suit or proceeding has been brought in an inconvenient forum. Any process in any action, suit or proceeding arising out of or relating to this agreement may, among other methods permitted by law, be served upon Grantor by delivering or mailing the same in accordance with paragraph 14.05 hereof. Any such process may, among other methods, be served upon Artist or any other Person who approves, ratifies, or assents to this agreement to induce R N D to enter into it, by delivering the process or mailing it to Artist or the other Person concerned in the manner prescribed in paragraph 14.05.

14.08   The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof. This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment SW be binding upon R N D unless confirmed by a written instrument signed by Darin Gates.

## 15. GROUP ARTIST

15.01  (a) Grantor warrants, represents and agrees that, for so long as this agreement shall be in effect, Artist will perform together as group for R N D. If any individual comprising Artist refuses, neglects or fails to perform together with the other individuals comprising Artist in fulfillment of the obligations agreed to be performed under this agreement or leaves the group, Grantor shall give R N D prompt written notice thereof (The term "leaving member" shall hereinafter be used to define each individual who leaves the group or no longer performs with the group, or each member of the group if the group disbands). R N D shall have the right, to be exercised by written notice to Grantor ninety (90) days following its receipt of Grantor's notice:

(i)      To continue with the services of any such leaving member pursuant to paragraph 15.04 below;

(ii)      To terminate the Term of this agreement with respect to the remaining members of Artist whether or not R N D has exercised its right to continue with the services of a leaving member;

(iii)      To treat all the members of Artist as leaving members, and have the right to exercise its rights with respect to each in accordance with this Article 15.

(b) In the event that R N D fails to send notice of R N D's exercise of rights pursuant to paragraph 15.01 (a) above, the Term of this agreement shall be deemed terminated with respect to such leaving member.

(c) If at any time R N D believes or has knowledge that a member or Artist is or may be a leaving member, then R N D shall have the right (but not the obligation) to exercise R N D's rights in accordance with this Article 15. If R N D sends a notice to Grantor pursuant to this paragraph 15.01(c), Grantor shall have the right, within fifteen (15) days following the date of such notice, to furnish R N D with affirmative documentation that the member of Artist shall continue to fulfill such member's obligations under this agreement and remain a member of Artist. Such documentation shall be satisfactory to R N D in its sole discretion and shall include, without limitation, a signed notification from the member that such member shall continue as a member of Artist. Notwithstanding anything to the contrary expressed or implied in this paragraph 15.0l(c), R N D's action or inaction with respect to R N D's belief or knowledge that a member of Artist may be, or may become, a leaving member shall not act as a waiver of any of Grantor's duties, obligations, representations or warranties under this Agreement, including, but not limited to, those obligations under paragraph 15.01(a) , or as a waiver of any of R N D's rights or remedies under this Agreement.

15.02  A leaving member, whether or not his engagement is terminated hereunder, may not perform for others for the purpose of recording any selection as to which the applicable restrictive period specified in paragraph 10.04 of this agreement has not expired.

15.03  A leaving member shall not, without R N D's consent, use the professional name of the group in any commercial or artistic endeavor; the said professional name shall remain the property of Grantor and those members of the group who continue to perform their obligations hereunder and whose engagements are not terminated; and , the person, if any, engaged to replace the individual whose engagement is terminated shall be mutually agreed upon by R N D and Grantor and each such person added to Artist, as a replacement or to otherwise, shall become bound by the terms and conditions of this agreement and shall execute a letter in the form attached hereto as Exhibit "A" as a condition precedent to being so added. Changes in the individuals comprising Artist shall be made by mutual agreement between Grantor and R N D.

15.04  In addition to the rights provided in the preceding paragraphs, R N D shall have, and Grantor hereby grants to R N D, an irrevocable option for the individual and exclusive services of each leaving member as follows: Said option, with respect to such individual, may be exercised by R N D giving Grantor notice in writing within ninety (90) days after R N D receives Grantor's notice provided for in paragraph 15.01(a) above. In the event of R N D's exercise of such option, Grantor and such leaving member shall be deemed to have entered into an agreement with R N D with respect to such individual's exclusive recording services upon all the terms and conditions of this agreement except that : (i) the Minimum Recording Obligation in the Initial Period shall be two (2) Sides, with an overall option, at R N D's election, for sufficient additional master Recordings to constitute up to one (1) Album, with an additional number (the "Number") of options granted to R N D to extend the term of such agreement for consecutive options shall be exercised within nine (9) months after delivery to R N D of the Minimum Recording Obligation for the immediately preceding contract period of such leaving member's agreement. The Number shall be equal to the remaining number of Albums embodying performances of Artist which Grantor would be obligated to deliver hereunder if R N D exercised each of its options, but in no event shall the Number be less than four (4); (ii) R N D shall pay all Recording Costs for Master Recordings to be Recorded by such individual up to the amount of the budget approved by R N D therefor; (iii) R N D's royalty obligation to Grantor in Respect of Recordings by such individual shall be the payment to Grantor of the royalties computed as set forth herein; (iv) R N D shall be entitled to combine such leaving member's account with the Artist account hereunder; and (v) Recordings by such individual shall not be applied in diminution of Grantor's Minimum Recording obligation as set forth in this agreement.

15.05 Neither Grantor nor Artist shall have the right, so long as this agreement is in effect, to assign Artist's professional name (s) or to permit its use by any other individual or group of individuals without R N D's prior written consent, and any attempt to do so shall be null and void and shall convey no right or title. Without

limitation of the generality of paragraph 5.04 above, Grantor hereby represents and warrants that it is the owner of the professional name mentioned on the first page of this agreement, and that no other Person, firm or corporation has the right to sue said professional name or to permit it to be used in connection with Phonograph Records, and that it has the authority to grant R N D the right to use said professional name. R N D shall have the right to use said professional name in accordance with the provisions hereof.


T. D. A.                                              R N D Productions, Inc.


BY: _Jamaica Johnson_                    BY: _____
        Jamaica Johnson


_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_
        Tax ID# / SS#